Robert E. KEATHLEY *v.* Billie A. KEATHLEY

CA 01-423                                        61 S.W.3d 219

Court of Appeals of Arkansas
Division II
Opinion delivered December 5, 2001

152

*Frances Morris Finley*, for appellant.

*Janice W. Vaughn*, for appellee.

WENDELL L. GRIFFEN, Judge. Robert Keathley appeals from a divorce decree allocating certain marital property and debt between him and his ex-wife, Billie Keathley, the appellee. He argues that the trial court erred because it made an unequal distribution of property without considering all the factors set forth in Arkansas Code Annotated section 9-12-315 (Supp. 2001), and because it considered fault as the basis for the unequal division of the marital property. We hold that the chancellor was not obligated to enumerate every factor when she analyzed the property allocation. Thus, we affirm.

The parties in this case were married on June 17, 1988. At that time, appellee was fifty-one years old and worked for Twin City Bank as a vice-president in the Credit Administration Department, where she had worked for twenty-six years. Appellant, then fifty-five, worked in the investment department at Simmons First National Bank. Appellant thereafter left the bank and began selling insurance. In 1992 or 1993, appellant had a stint placed in one of his arteries, and voluntarily retired from work. He drew Social Security retirement benefits of approximately $836 per month.

Appellee continued to work until May 2000, when her job was eliminated as the result of the sale and merger of her bank to Firstar Bank. She retired with a pension vested in the amount of $199,264.15, and a 401k plan with a net value of $64,626.21. Appellee subsequently accepted a part-time position working at her

daughter's resale shop. Thus, she began spending more time at home during the weekdays. During the first week after appellee left the bank, she began receiving calls from creditors regarding credit-card debts in her name. Around this same time, appellant suggested that they file for bankruptcy.

At the time the parties married, they had little or no credit card debt. Due to the calls from the creditors, appellee contacted a credit bureau and discovered that appellant had, without her knowledge, authority, or signature, obtained credit cards in his name, her name, and in their joint names. Their credit-card debt totaled over $100,000, and appellant had paid at least an additional $37,407 on credit-card debts in the preceding few years.

As a result, one week after appellee left the bank, she separated from appellant and filed for divorce. Although the proceedings were not designated for inclusion in the record by appellant, a temporary hearing was held on July 20, 2000. During that proceeding, appellant apparently admitted that he signed appellee's name to certain credit-card applications. The chancellor referred to appellant's testimony to this effect in both of the final hearings on the matter and in the divorce decree from which appellant appeals.

The final hearings were held on September 25, 2000, and October 20, 2000. At the divorce hearing, appellee offered evidence that she filed fraud reports with all of the creditors with whom appellant had opened an account in his name, her name, or their joint names, and had been relieved of three debts originally placed in their joint names totaling $20,718.34. She asserted that at the time of trial, she had not been relieved of unauthorized debt totaling $43,732.30. Of these debts, appellee admitted to signing the credit application for a joint card, a Bank of America card. However, she maintained that she last used the card years ago and that she had since paid the balance due on those charges. This card had an outstanding debt remaining of $10,979.

Appellee maintained that most of the credit card debt accumulated by appellant was accumulated by making cash advances for gambling because many of the cash advances were made at the Oaklawn Race Track and other Hot Springs locations. Between January 1998 and April 2000, appellant obtained at least $83,641 in cash advances. During this time period, he obtained an average cash advance of $2,987 per month.

Appellee performed most of the household duties even though she continued to work after appellant retired. Appellant handled the checkbook and paid the bills. In 1996, after an argument between the parties over appellant's failure to clean up after himself in the house, he began to do so.

When the parties married, appellant owned a home and had accumulated $25,000 in equity in the home. He sold this home and used $8,500 of the proceeds as a down payment on a new home that was acquired in joint tenancy. In 1999, when the parties sold the home, the debt on the home had been reduced from $73,000 to $54,000, a $19,000 reduction. They then bought the current marital home, using $30,000 from the sale proceeds of their previous home as a down payment. The day before the final hearing in this case, the parties sold the marital home and received net proceeds of $18,000 from the sale. Both parties asked the court to order an equal division of these proceeds.

At the close of trial, the court requested a written proposal from each party explaining how each party wanted the court to divide the parties' assets and debts. Appellant proposed that the court divide the house proceeds equally, that he be obligated for all of the credit-card debt except the Bank of America card, and that he receive one-half of the marital portion of appellee's 401k and pension plan.

The chancellor found that appellant did nothing to contribute to the acquisition, preservation or appreciation of the marital property and did not even provide services as a homemaker. The chancellor further found that appellant's conduct in depleting the assets that appellee worked to accumulate rose to the level of fraud. She ordered appellant to pay all of the credit-card debts that he incurred without appellee's knowledge or approval. She noted that appellant made false statements to the court by admitting at the temporary hearing that he had signed appellee's name to credit-card applications and then at the final hearing attempting to claim that appellee incurred the debt. The chancellor also noted that when she reminded appellant that he had previously admitted signing for the credit card in appellee's name, he claimed that he could not remember whether he signed for credit in her name.

The chancellor valued the entire portion of the $64,626.21 of pension plan as marital property and awarded appellant ten percent, or $6,462.62. However, from this amount, she deducted appellee's attorney's fees of $3,500, for a net distribution to appellant of

$2,963.62. The chancellor found that it was appellant's fraudulent behavior that necessitated the need for appellee to incur most of her attorney's fees.

The chancellor also set aside another ten percent of the pension plan for the satisfaction of unresolved unauthorized debts, which she found totaled $32,753.30. She found the $10,979 Bank of America debt was a joint debt. She ordered an additional ten percent of the pension plan to be set aside to pay any portion of the Bank of America Card debt remaining on that card after proceeds from the sale of the parties' home was used to pay the Bank of America debt. The chancellor further ordered that this additional ten percent shall be used to set off one-third of various marital debts totaling $4,068 that appellee had already paid.

The chancellor valued the marital portion of appellee's 401k account at $26,057.08 as of the date of trial. Because there was a loan issued against this account, that loan must be paid in full and a $7,000 penalty will be assessed against the remaining balance in the account upon removal of the funds. Therefore, the court ordered that 20% of the penalty incurred should be deducted from appellant's share of the proceeds from this account and 80% of the penalty shall be deducted from appellee's share of the proceeds.

The chancery court ordered that another 10% of the 401k fund be set aside in the same manner as the 10% set aside from appellee's pension fund. The funds will first be used to offset any debt remaining on the Bank of America debt, then to reimburse appellee for any debts she previously paid, and finally, to reimburse appellee for any unresolved indebtedness.

The chancellor specified that should appellee be able to relieve herself of liability of the unresolved debts by February 15, 2001, any funds remaining in the set aside account, as well as any funds remaining from the 401k account would become appellant's property. However, if she is not able to relieve herself of these debts by that date, the funds in an amount equal to any remaining unresolved accounts shall revert to appellee to compensate her for her liability on those debts. The court ordered that appellee would receive the remaining funds of the pension plan, that is 80% of the marital portion of the account, and 100% of the nonmarital portion of the account.

With regard to the parties' marital home, the court found that the reduction in debt was attributable to appellee's efforts. Pursuant

to both parties' requests that the home be sold and the proceeds split, the court ordered the home to be sold and that each party was to receive $5,000 in net equity proceeds. The remaining proceeds from the sale of the home were to be removed from escrow and given to appellee to pay off the Bank of America account ($10,979). The chancellor stated that by dividing the funds from the sale of the house in this manner, she was dividing the funds equally. Appellant appeals from this order.[1]

### I. Consideration of Factors under Ark. Code Ann. § 9-12-315(B)

Appellant first argues that the trial court erred because it failed to consider all of the factors listed in Ark. Code Ann. section 9-12-315, and instead, ordered an unequal division of property based on the sole finding that appellant did not contribute to the acquisition, preservation, and/or accumulation of the parties' assets.

A chancellor has broad powers to distribute property in order to achieve an equitable distribution. *See Hodges v. Hodges*, 27 Ark. App. 250, 770 S.W.2d 164 (1989). The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *See Hoover v. Hoover*, 70 Ark. App. 215, 16 S.W.3d 560 (2000). A chancellor's unequal division of marital property will not be reversed unless it is clearly erroneous. *See id.* A chancery court's finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *See Lammey v. Eckel*, 62 Ark. App. 208, 970 S.W.2d 307 (1998). In reviewing a chancery court's findings, we defer to the chancellor's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *See Jennings v. Burford*, 60 Ark. App. 27, 958 S.W.2d 12 (1997).

Arkansas Code Annotated section 9-12-315 governs the division of marital property and provides in relevant part:

(a) At the time a divorce decree is entered:

---

[1] The chancellor also ordered that each party was to receive his nonmarital property as well as the vehicle each was driving. Appellee was ordered to quitclaim her interest in 9 Hot Springs Village lot to appellant. The parties do not dispute these distributions or the division of personal property ordered by the court.

(1)(A) All marital property shall be distributed one-half (½) to each party unless the court finds such a division to be inequitable. In that event the court shall make some other division that the court deems equitable taking into consideration:

    (i) The length of the marriage;

    (ii) Age, health, and station in life of the parties;

    (iii) Occupation of the parties;

    (iv) Amount and sources of income;

    (v) Vocational skills;

    (vi) Employability;

    (vii) Estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income;

    (viii) Contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and

    (ix) The federal income tax consequences of the court's division of property.

(B) When property is divided pursuant to the foregoing considerations the court must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the order entered in the matter.

(2) All other property shall be returned to the party who owned it prior to the marriage unless the court shall make some other division that the court deems equitable taking into consideration those factors enumerated in subdivision (a)(1) of this section, in which event the court must state in writing its basis and reasons for not returning the property to the party who owned it at the time of the marriage.

Appellee argues that the chancellor did not err because she was not required to weigh all of the factors equally and was not required to list each of the factors in her order. In addition, appellee maintains that the chancellor heard evidence pertaining to most of the factors and that the divorce decree itself discusses most of these factors. We agree.

■ ■ While the statute requires the chancellor to consider certain factors and to state the basis for an unequal division of marital property, a plain reading shows that it does not require the chancellor to list each factor in her order, nor to weigh all factors equally. Appellant cites no authority to that effect. Further, the specific enumeration of these factors does not preclude a chancellor from considering other relevant factors, where exclusion of other

factors would lead to absurd results or deny the intent of the legislature to allow the chancellor to make an equitable division of property. *See Stover v. Stover*, 287 Ark. 116, 696 S.W.2d 750 (1985). Rather, where it is clear upon *de novo* review that the chancellor considered the relevant factors, this court should affirm. *See Pennybaker v. Pennybaker*, 14 Ark. App. 251, 687 S.W.2d 524 (1985).

The chancellor found that appellant "did nothing to contribute to the acquisition, preservation or appreciation of marital property, including services as a homemaker. Indeed, Mr. Keathley spent the last eight (8) years dissipating the assets Mrs. Keathley was working to accumulate, and his actions rise to the level of fraud against Mrs. Keathley."

Appellant maintains that although the chancellor recited her basis for the unequal division of property, it is "clear" from the decree that she did not consider all of the factors that she should have considered, such as: 1) appellant served as the homemaker because he paid all of the bills, wrote all of the checks and cleaned up after himself; 2) he has heart problems, is unemployable, and has no savings; 3) there is no evidence the money was used for anything other than household or marital debts; 4) there was no testimony as to who was responsible for each and every cash advance nor what the money was used for; 5) he worked for nearly five years of their twelve-year marriage and owned the home that originally enabled them to buy another home; and 6) appellee could not reasonably assert that she did not know he was getting the money because she worked in the credit department of a bank, because she admitted that she occasionally used the cards and had attended races with appellant, and because she knew the money to pay for her new house and car had to come from "somewhere."

██ ██ Clearly, the court is required to consider the services of a homemaker in dividing the marital property. *See Stuart v. Stuart*, 280 Ark. 546, 660 S.W.2d 162 (1983). However, the chancellor is not required to find that a party's homemaker services contributed to the acquisition or preservation of the marital assets. Here, appellant took care of the finances and cleaned up after himself. However, appellee continued to perform the majority of the household chores while working outside of the home. Moreover, it is undisputed that appellant's "handling" of the parties' finances was what enabled him to work the fraud in this case. Appellant's assertion that this case would be decided differently if he were female is without merit. This court has upheld the unequal division of property in

favor of the husband on similar grounds. *See, e.g., Forsgren v. For-sgren,* 4 Ark. App. 286, 630 S.W.2d 64 (1982)(affirming unequal distribution of stock where wife excessively consumed alcohol and drugs resulting in massive medical bills and only contributed services as a homemaker). On these facts, the chancellor was not required to find that appellant's household services contributed to the acquisition or maintenance of the parties' assets.

Appellant also maintains that the chancellor ignored that he is in poor health, presumably due to a heart condition. However, he provided no proof to this effect. Appellee testified that appellant had a stint placed in one of his arteries due to a blockage in 1993, but that his health was good. Further, the evidence is clear that his health was good enough to play golf, shoot pool, and to travel to Hot Springs to attend horse races.

Appellant also asserted that the money was used to deposit into the parties' checking account to pay bills. However, despite repeated questioning by the chancellor with regard to proof on this issue, he failed to provide evidence that he deposited the money into their joint checking account. Appellant further argues that there was no evidence that this money was *not* used for household or other marital expenses. Given the evidence in this case, this assertion is patently untrue.

Appellant also asserts that appellee either acquiesced to the debt accumulation or should have known what was going on. However, appellee testified that the parties had little credit card debt when they married and she thought their only outstanding debts were car and house payments. Because her income alone, $40,000 per year, was sufficient to cover those expenses, and because appellant handled their finances, she had no reason to suspect that appellant was accumulating credit card debt in her name without her authorization.

Appellant also asserts that there is no proof as to who made the ATM withdrawals and that the chancellor would have to infer that he gambled the money away. To the contrary, appellee testified that when she used the ATM, it was taken from the parties' checking account and she informed appellant when she did so because he handled the checkbook. She flatly stated that she made no credit-card ATM withdrawals.

Moreover, while it is true that appellant did not admit that he "gambled the money away" or made cash advances for the

purpose of gambling, he stated during the proceedings: "That month on the bank statements I showed you, I wouldn't be surprised if I took $1,500 in cash advances that month — most of them in Hot Springs. Of the hundreds of thousands of dollars, I wouldn't be surprised at all." The chancellor was entitled to draw reasonable inferences based upon the evidence, *see Kesterson v. Kesterson*, 21 Ark. App. 287, 731 S.W.2d 786 (1987), and it was reasonable on the facts of this case for the chancellor to infer that appellant gambled away the cash advances he fraudulently obtained. Nonetheless, the reason that appellant incurred the debt is arguably irrelevant. The evidence established that he fraudulently incurred the debt in appellee's name, for whatever reason.

Thus, it is clear that the chancellor considered the relevant statutory factors. Further, she referenced numerous factors in her order. She heard evidence of, and referred in her order to, the length of the parties' marriage, the age, health, and station in life of the parties, their occupations, the sources and amounts of their incomes and assets, their liabilities and needs, each party's efforts or lack thereof in making and preserving the marital assets, and the tax consequences regarding the 401k. account. It is apparent that the chancellor properly considered the relevant statutory factors. Therefore, we find no error in this respect.

## II. Fault as a Ground for Unequal Distribution of Marital Property

Appellant's second argument is that the chancellor improperly considered fault as the basis for the unequal distribution of the parties' marital property and debt. Appellant cites *Leonard v. Leonard*, 22 Ark. App. 279, 739 S.W.2d. 697 (1987), and the dissent in *Stover v. Stover*, 287 Ark. 116, 696 S.W.2d 750 (1985), for the proposition that fault is not a proper consideration, even when it is clothed under the statutory requirement to consider the contribution of each party in acquisition of property. Appellant argues in essence that the chancellor ignored the equities weighing in his favor and ordered an unequal division of property based on his fraudulent conduct alone.

We are not persuaded by appellant's argument. First, his position fails to recognize the distinction between fault and equity. The predecessor statute to section 9-12-315, Arkansas Statute Annotated § 34-1215, dictated that marital property be divided equally, regardless of fault. However, this statute was amended and

now allows the chancellor to make an unequal distribution of marital property, as long as the chancellor specifies the basis for making the unequal distribution. As appellee notes, in some cases, that decision will necessarily be based on action or the failure to act, which in a literal sense of the word, could be considered fault. *See, e.g., Stover v. Stover, supra* (affirming unequal distribution where wife attempted to have her husband killed); *Forsgren v. Forsgren, supra.* Nonetheless, such equitable considerations are always proper factors for the chancellor to consider.

Second, we are not convinced that the chancellor ignored any evidence in this case or improperly considered "fault." Appellant maintains that the chancellor's division of the proceeds from the sale of the house ignores that he entered into the marriage with a home that was sold. Although appellant attempted to represent that the entire $25,000 in equity from his home was used as a down payment on the parties' second home, the record shows that only $8,500 of this money was used for the down payment. The chancellor did not ignore this fact because she mentioned it in her order. When a husband and wife hold real property as tenants by the entirety, it is presumed that the spouse who furnished the consideration made a gift in favor of the other spouse, and this presumption can only be rebutted by clear and convincing evidence. *See Lyle v. Lyle,* 15 Ark. App. 202, 691 S.W.2d 188 (1985). Appellant presented no evidence to rebut this presumption.

The chancellor purported to equally divide the proceeds of the sale of the parties' marital home. It is true that the proceeds from the sale of the parties' marital home were not divided "equally" in a strict sense because the parties received $18,000 in sale proceeds and appellant was awarded only $5,000. However, the fact that appellant had fraudulently incurred debt for gambling or other purposes was a proper consideration in the chancellor's unequal division of the proceeds from the sale of the house. *See Barker v. Barker,* 66 Ark. App. 187, 992 S.W.2d 136 (1999)(*reversed and remanded on other grounds*)(noting the chancellor awarded the first $7,500 of the sale proceeds to the nongambling spouse, with the remaining proceeds to be split equally between the parties).

Moreover, that the proceeds were not divided equally inures to appellant's benefit, because the proceeds were divided in such a manner to further reduce the unauthorized debt for which appellant will ultimately be liable. The chancellor ordered part of

the proceeds from the sale of the marital home to reduce unauthorized debt on a joint credit card, instead of merely ordering appellant to pay that debt. While appellant provided the money for the down payment on the parties' first home, the chancellor found that the debt reduction on the parties' second home, which allowed them to retain $30,000 in proceeds upon the sale of that home to use as a down payment for their marital home, was due to the efforts of appellee. Although the division of the proceeds was not equal, it certainly was not inequitable.

Finally, appellant maintains that the chancellor erred because he only received a net distribution of $2,962.62 from the pension plan and $2,605.71 from the 401k plan. He was ordered to pay all of the unauthorized debt, totaling $32,753.30, as well as one-third of the $4,067 in debts already paid by appellee. Appellant asserts that the property division statute was not designed to "saddle" the homemaker with all of the marital debt because he or she is not earning income.

The short answer to this argument is that appellant has not been unfairly "saddled" with all of the marital debt. The statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *See Creson v. Creson*, 53 Ark. App. 41, 917 S.W.2d 553 (1996). Further, a chancellor has the power to adjust the marital debts as between the parties. *See Hackett v. Hackett*, 278 Ark. 82, 86, 643 S.W.2d 560, 562 (1982). Appellant was ordered to pay all of the debt for the credit cards that he fraudulently obtained in appellee's name and will be liable for only one-third of the legitimate marital debt that appellee has already satisfied. Part of the unauthorized debt for which he is responsible will be reduced by the sale of the home and by the set-aside funds from the pension plan and the 401k plan. In addition, if appellee is able to relieve herself of liability for the outstanding unauthorized debts, appellant will receive approximately $20,000 remaining in the 401k plan. It is apparent that the chancellor allocated the debt to each party based on her judgment about which of them should equitably be required to pay the debt.

Moreover, appellant agreed in his proposed findings of facts and conclusions of law that he would be responsible for all unauthorized credit-card debt other than the Bank of America card. An appellant may not complain on appeal that the chancellor erred

if he induced, consented to, or acquiesced in the chancellor's position. *See Anderson v. Anderson*, 60 Ark. App. 221, 963 S.W.2d 604 (1998).

 ██ Equity does not require that appellee exhaust her retirement to pay debts that were fraudulently incurred by appellant. To hold that the chancellor was not allowed to make an unequal distribution of property on the facts of this case would defeat the legislative intent to allow for an equitable distribution of marital property. Considering that appellant fraudulently accumulated over $100,000 in credit-card debt, for whatever purposes, and considering that appellee may still be responsible for approximately $30,000 in unresolved debt, an amount which is not completely covered by the set aside funds, we have no reason to hold that the chancellor's findings in this case were clearly erroneous.

Affirmed.

STROUD, C.J., and PITTMAN, J., agree.